**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| JOHN PATTERSON<br><br>*Plaintiff,*<br><br>vs.<br><br>NOVO NORDISK INC. and<br>NOVO NORDISK A/S,<br><br>*Defendants.* | : | CIVIL ACTION NO.:<br><br>COMPLAINT AND<br>JURY DEMAND |

## COMPLAINT AND JURY DEMAND

COMES NOW, John Patterson, by and through the undersigned counsel, and brings this complaint against Defendants Novo Nordisk Inc. and Novo Nordisk A/S, (hereinafter collectively referred to as "Defendant(s)" or "Novo" or "Novo Nordisk"), for the serious and life-altering injuries he suffered as a result of Defendants' drug Ozempic.

## INTRODUCTION

1. Vision is the most dominant of the senses and plays a critical role in every facet and stage of our lives. Without vision, a person will struggle to learn, walk, read, and work.

2. Vision loss can lead to worsened mental health, loss of or limited employment, social isolation, and the need for a caregiver.

3. Non-arteritic Anterior Ischemic Optic Neuropathy ("NAION") is an irreversible condition that causes sudden and permanent vision loss.

4. Vision loss with NAION is untreatable and can result in permanent blindness.

5. Vision loss with NAION is sudden and usually discovered when a person wakes

up in the morning and notices a loss of their vision in one eye.

6. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision. For most patients with NAION, the vision loss will not improve with time. Some will experience progressive worsening of their vision after the initial vision loss.

7. About 15% of patients who have NAION in one eye eventually develop it in their other eye too.

8. Plaintiff John Patterson's life has been permanently altered by his NAION diagnosis. Plaintiff honorably served his country for 20 years on active duty in the United States Air Force. Throughout his military career, Plaintiff dedicated himself to serving and protecting others. After a lifetime of service and sacrifice, Plaintiff did not expect that a prescription medication intended to improve his health would instead cause a devastating injury that would take away his vision and diminish his independence and livelihood.

9. Ozempic (semaglutide) belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

10. Defendants knew, or should have known, based on preclinical trials, premarket clinical trials, post-market surveillance, and adverse event reports of NAION injuries with Ozempic or semaglutide drugs, that there was reasonable evidence of a causal association between the use of Ozempic and NAION.

11. Despite this knowledge, Defendants failed to adequately warn physicians, patients, and the public about the risk of NAION associated with Ozempic, leaving patients like Plaintiff without the information necessary to make informed decisions regarding the risks and benefits of using this medication.

**PARTIES**

12. At all relevant times hereto, Plaintiff John Patterson is a resident and citizen of the state of Georgia in the county of Walker.

13. Plaintiff was prescribed and took Ozempic as directed by his physicians.

14. As a result of his use of Ozempic, Plaintiff was caused to suffer NAION and its sequelae, which resulted in severe and permanent personal injuries, suffering, emotional distress, and economic damages.

15. Defendant Novo Nordisk Inc. is a Delaware corporation that has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

16. Defendant Novo Nordisk Inc. is wholly owned by Novo Nordisk US Commercial Holdings, Inc and Novo Nordisk US Commercial Holdings Inc., is wholly owned by Novo Nordisk US Holdings Inc.

17. Novo Nordisk US Holdings Inc. is a Delaware corporation with a principal place of business at 103 Foulk Road, Wilmington, Delaware. Novo Nordisk US Holdings Inc. is wholly owned by Defendant Novo Nordisk A/S.

18. Defendant Novo Nordisk A/S is a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsvaerd, Denmark.

19. Novo Nordisk Pharmaceutical Industries LP is a Delaware corporation with a principal place of business at 3611-3612 Powhatan Road, Clayton, North Carolina.

20. The Novo Defendants' website states that "the vast majority of our U.S. injectable diabetes and obesity products are produced and packaged at the Clayton aseptic fill-finish site. Upon information and belief, this refers to Novo Nordisk's manufacturing facility in Clayton, North Carolina, operated by Novo Nordisk Pharmaceutical Industries LP.

21. The Novo Defendants was the agent and employee of the other Novo Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other Novo Defendants' actual and implied permission, consent, authorization and approval.

22. In collaboration amongst themselves, as part of their business, and at all relevant times, the Novo Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed GLP-1 RA drugs, including Ozempic, Rybelsus, Wegovy, Victoza, and Saxenda

**JURISDICTION AND VENUE**

23. This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) as the matter in controversy exceeds the value of $75,000, exclusive of interest and costs and because Defendants are incorporated and have their principal places of business in states other than the state in which Plaintiff resides, which is Georgia.

24. This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

25. Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this District. Defendants routinely market their products at issue in this District and conduct business in this District. Venue is further proper as Plaintiff is a resident of Georgia, was prescribed Defendants' product in the state of Georgia, and it is where his injury and subsequent treatment has occurred.

26. On December 15, 2025, the United States Judicial Panel on Multidistrict Litigation ordered that the Eastern District of Pennsylvania is an appropriate transferee district for litigation alleging that Novo Nordisk's GLP-1 RA drugs (specifically, Ozempic, Wegovy,

Saxenda, and Trulicity) caused them to suffer from non-arteritic anterior ischemic optic neuropathy ("NAION"). *See In Re: Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAS) Non-Arteritic Anterior Ischemic Optic Neuropathy Products Liab. Lit.*, Case No. MDL 3163 at DE 49.

## FACTUAL ALLEGATIONS

### A. An Accidental Blockbuster: The Development of Ozempic and Wegovy

27. In the early 1990s, Novo Nordisk researchers discovered that when they injected into rats a chemical compound known as liraglutide—a GLP-1 (glucagon-like peptide-1) agonist—the drug caused the rats to stop eating almost entirely.[1]

28. GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.[2] An agonist is a manufactured substance that attaches to a cell receptor and causes the same action as the naturally occurring substance.[3] Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.

29. To describe the process in other words, GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone. The higher the dose of the GLP-1 agonist, the more extreme the effects.[4]

30. "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew

[1] Gina Kolata, *We Know Where New Weight Loss Drugs Came From, but Not Why They Work*, N.Y. Times (Aug. 17, 2023), https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Nov. 13, 2025).

[2] GLP-1 Agonists, CLEVLAND CLINIC *available at* https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Feb. 13, 2025).

[3] *Id.*

[4] *Id.*

there was something in some of these peptides that was really important for appetite regulation."[5]

31. Later testing in human subjects revealed that those who received an intravenous drip of GLP-1 agonist ate 12% less at a lunch buffet than those who got a placebo.[6]

32. Consequently, Novo Nordisk decided to study liraglutide as not only a diabetes drug which had been shown to lower blood sugars, but also as a drug to treat obesity.[7]

33. Years later, in 2010, liraglutide was approved for the treatment of diabetes by the FDA under Novo Nordisk's brand name Victoza,[8] at which point Novo Nordisk moved forward with studying the drug for weight loss.[9]

34. After clinical trials, in 2014, the FDA approved liraglutide as a daily injectable for treatment of obesity under Novo Nordisk's brand name, Saxenda.[10]

35. Saxenda's effects on weight loss, however, were modest; patients lost about 5% of their weight.[11]

36. In an effort to find ways to make a longer-lasting GLP-1 agonist so patients would not have to inject themselves every day, Novo Nordisk created a new molecule with the chemical name semaglutide.[12]

37. Novo Nordisk branded semaglutide as Ozempic, and on December 5, 2016, the Novo Nordisk Defendant announced submission of Ozempic's new drug application (NDA) to

[5] Kolata, *We Know Where New Weight Loss Drugs Came From*, *supra*.
[6] *Id*.
[7] *Id*.
[8] Jackson S.H., Martin T.S., Jones J.D., Seal D. & Emanuel F., *Liraglutide (Victoza): The First Once-Daily Incretin Mimetic Injection for Type-2 Diabetes*, 35 P & T: A Peer-Reviewed Journal for Formulary Management 498 (Sept. 2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC2957743/ (last visited Nov. 13, 2025).
[9] Kolata, *We Know Where New Weight Loss Drugs Came From*, *supra*.
[10] *Id*.
[11] *Id*.
[12] *Id*.

the FDA for regulatory approval of a once-weekly injectable, in 0.5 mg or 1 mg doses, for treatment of Type 2 diabetes. In the announcement, Defendant represented that in clinical trials "once-weekly" Ozempic had a safe and well-tolerated profile, and Defendants represented that the most common adverse event was nausea.[13]

38. On December 5, 2017, the FDA approved the Ozempic application and granted premarket approval as NDA 209637.[14]

39. When Novo Nordisk announced that they had started selling Ozempic in the United States, they touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" Novo Nordisk offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription for up to two years."

40. In addition to diabetic control, Ozempic also caused 15% weight loss, which was three times the loss caused by its predecessor, Saxenda.[15]

41. Just one year after Ozempic's approval for diabetes, Defendants started a clinical trial in patients who were overweight or suffered from obesity.[16]

42. The results of the trial demonstrated that for participants who were overweight or obese, 2.4 mg of semaglutide, once weekly, plus lifestyle intervention was associated with

---

[13]Novo Nordisk A/S, *Novo Nordisk Files for Regulatory Approval of Once-Weekly Semaglutide in the U.S. and EU for the Treatment of Type 2 Diabetes* (Dec. 5, 2016), https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited Nov. 13, 2025).

[14]Food & Drug Administration, Letter re Approval of New Drug Application No. 209637 (Dec. 5, 2017), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/209637s000ltr.pdf#:~:text=We%20are%20waiving%20the%20pediatric%20study%20requirement,the%20pediatric%20study%20has%20not%20been%20completed (last visited Jan. 30, 2026).

[15]Kolata, *We Know Where New Weight Loss Drugs Came From*, *supra*.

[16] *Id.*

sustained, clinically relevant reduction in body weight.[17]

43. On March 20, 2019, Defendants submitted a supplemental new drug application (sNDA) for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.18 On January 16, 2020, the FDA approved this new indication.[19]

44. By March of 2021, Defendant had completed the clinical trial studying semaglutide for weight loss, and its results were published March 18, 2021.20

45. In addition to the results, the published study, which was funded by Defendants, argued: "Obesity is a chronic disease and global public health challenge."[21]

46. Then, on May 28, 2021, Defendants submitted another sNDA requesting approval for a higher, 2 mg dose of Ozempic injection. On March 28, 2022, the FDA approved this request.[22]

---

[17] John P.H. Wilding, Rachel L. Batterham, Salvatore Calanna et al., *Once-Weekly Semaglutide in Adults with Overweight or Obesity*, 384 *New Eng. J. Med.* 989 (2021), https://doi.org/10.1056/NEJMoa2032183 (last visited Jan. 30, 2026).

[18] Novo Nordisk, *Novo Nordisk Files for U.S. FDA Approval of Oral Semaglutide for Blood-Sugar Control and Cardiovascular Risk Reduction in Adults with Type 2 Diabetes*, PR Newswire (Mar. 20, 2019), https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited Nov. 13, 2025).

[19] Food & Drug Administration, Letter re Supplemental New Drug Application No. 209637/S-003 (Jan. 16, 2020), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (last visited Nov. 13, 2025).

[20] Wilding, *Once-Weekly Semaglutide in Adults with Overweight or Obesity supra.*

[21] *Id.*

[22] U.S. Food & Drug Admin., *Approval Letter for Ozempic (semaglutide) Injection, NDA 209637/S-009* (Mar. 28, 2022), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (last visited Jan. 30, 2026).

47. In its press release, Defendants represented Ozempic as having "proven safety and efficacy" and Defendants continued to advertise that "it can help many patients lose some weight."[23] As with its prior press releases, Defendants disclosed Important Safety Information and provided links to the Medication Guide and Prescribing Information. However, severe gastrointestinal events, including gastroparesis and gastroenteritis, were not identified as risks. Nor was there any disclosure about risks of vision loss, including NAION.

48. On September 22, 2023, Novo Nordisk added "ileus" under Section 6-3 Postmarketing Experience of the Prescribing Information ("PI" or "label") in a revised Ozempic label.

49. The new label listed ileus as an adverse reaction reported during post-approval use of semaglutide, the active ingredient in Ozempic.

50. On September 6, 2024, the FDA notified Novo Nordisk of new safety information that it determined should be included in the labeling for GLP-1 RAs pertaining to the risk of pulmonary aspiration during general anesthesia or deep sedation.

51. On October 4, 2024, Novo Nordisk submitted a supplemental new drug application (sNDA 209637/S-032) and amendments for Ozempic incorporating the FDA's required safety modifications to the label.

52. On November 1, 2024, the FDA provided supplemental approval for sNDA 209637/S-032.

53. No version of the Ozempic label has ever warned patients or their doctors that

---

[23] Novo Nordisk, *Novo Nordisk Receives FDA Approval of Higher-Dose Ozempic 2 mg Providing Increased Glycemic Control for Adults with Type 2 Diabetes*, PR Newswire (Jan. 25, 2022), https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited Nov. 13, 2025).

taking Ozempic may cause NAION or result in permanent vision loss.

**Defendants Creates a Market: Millions Spent on Marketing and Promotion Create a Media Frenzy and Mega Seller**

54. Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for that specific indication,[24] but before Ozempic ever received separate approval for treatment of wight loss, Novo Nordisk had already begun mentioning weight loss in its Ozempic




commercials.[25]

55. On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic to the tune of the 1970s hit pop song "Magic" by Pilot, wherein Novo Nordisk advertised that "adults lost on average up to 14 pounds" when taking Ozempic.[26]

56. Over the next five years, Novo Nordisk spent $884,000,000 running television ads in the United States to promote its semaglutides, Ozempic, Wegovy, and its lesser known

---

[24] Kolata, *We Know Where New Weight Loss Drugs Came From*, *supra*.
[25] *Id.*
[26] *Id.*

GLP-1 agonists, Rybelsus, with most advertisements allocated towards Ozempic.[27]

57. Defendants also employed sophisticated use of social media to market Ozempic.

58. On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[28] and currently has over 1.2 billion views.[29]

59. The hashtag #ozempicjourney has 199.5 million views, as of September 9, 2023, on TikTok.

60. Novo Nordisk partnered directly with Meta and Instagram to run marketing campaigns. One diabetes marketing campaign achieved a dramatic 28% direct engagement rate with their polls.[30] This was a lauded result presented in a case study by Meta.

61. On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[31]

62. Novo Nordisk reportedly spent approximately one hundred million dollars advertising Ozempic last year.[32] Ozempic ranked as the sixth most advertised prescription drug brand in 2022, with a U.S. measured media spend of $181 million, according to Vivvix spending data and Pathmatics paid social data as reported in Ad Age Leading National Advertisers 2023.[33]

63. In 2023, over $491 million was spent advertising "diabesity" drugs, including

---

[27] *MedWatch*, "Pharma & Biotech – [Title of Article]", MedWatch, https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited Nov. 13, 2025).

[28] Dani Blum, What Is Ozempic, and Why Is It Getting So Much Attention?, N.Y. TIMES (Nov. 22, 2022), https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (last visited Jan. 30, 2026).

[29] https://www.tiktok.com/tag/ozempic (last visited on August 1, 2023).

[30] https://business.instagram.com/success/novo-nordisk (last visited Sept. 17, 2025).

[31] Daniel Lamb, *"Ozempic" Named One of the Hottest Brands in 2023*, Ad Age (Oct. 23, 2023), https://www.adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571/ (last visited Nov. 13, 2025).

[32] Jia Tolentino, *Will the Ozempic Era Change How We Think About Being Fat and Being Thin?*, 99 The New Yorker 48 (Mar. 27, 2023), https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited Nov. 13, 2025).

[33] Lamb, *"Ozempic" Named One of the Hottest Brands*, *supra*.

Ozempic and Wegovy.[34]

64. Novo Nordisk has spent millions of dollars delivering their message to physicians, healthcare providers, and consumers.

65. For example, Novo Nordisk spent over $33,000,000 in 2022 on traditional physician marketing and detailing according to Open Payments Data. [35]

66. In sum, Novo Nordisk promoted the safety, efficacy, and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets.

67. However, throughout its marketing, Defendants failed to disclose the true serious side effects of Ozempic, including but not limited to hospitalization and death.

68. Marketing Works: Novo Nordisk's Rampant Promotion Result in Thousands of Prescriptions and Billions in Sales

69. As a result of Novo Nordisk's all-encompassing advertising and promotion efforts, Ozempic is widely prescribed throughout the United States.

70. As of August 10, 2023, Novo Nordisk reported that in the first six months of 2023 sales of Ozempic jumped 50% to more than $3.7 billion.[36]

71. In July of 2021, doctors in the US wrote 62,000 prescriptions a week for

---

[34] Paul D. Sweeting, *Spending on Ozempic, Wegovy Surges*, MM&M (Sept. 29, 2023), https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/ (last visited Nov. 13, 2025).

[35] Centers for Medicare & Medicaid Services, *Open Payments: Company Profile #100000000144*, CMS (last visited Nov. 13, 2025), https://openpaymentsdata.cms.gov/company/100000000144

[36] Meg Tirrell, *Big Pharma's blockbuster obesity drug battle is headed for $100 billion*, CNBC (Sept. 9, 2023), https://www.cnbc.com/2023/09/09/big-pharma-blockbuster-obesity-drug-battle-is-headed-for-100-billion.html (last visited Jan. 30, 2026).

Ozempic.[37]

72. It has been reported that the huge demand created by extensive marketing has led to rampant off-label usage and "gaming" the system to allow for insurance coverage.[38]

73. In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[39]

74. This surge has reshaped Denmark's economy as the country has reaped huge profits from the sale of the drug, which is now solely responsible for the country's economic growth.[40]

75. Ozempic became so popular, that in August 2022, the FDA added Ozempic to its drug shortage list. Ozempic remained on the shortage list until February 2025 when the FDA announced the shortage had been resolved.

76. While Ozempic was listed as being in shortage, federal law and FDA guidance permitted compounding pharmacies to manufacture and distribute compounded versions of semaglutide. During this period, compounded semaglutide products entered the marketplace in large volumes.

77. Defendants knew or should have known that the prolonged shortage of Ozempic® would foreseeably result in widespread reliance on compounded semaglutide products by patients who could not obtain the branded drug.

---

[37] Blum, *Weight-Loss Drugs Are Transforming Obesity Treatment. But Are They Safe?*, *supra*.
[38] *Id*.
[39] Carolyn Y. Johnson, *Demand for Weight-Loss Drugs Is Surging, but Insurance Coverage Is Limited*, WASH. POST (June 11, 2023), https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited Jan. 30, 2026).
[40] Eshe Nelson, *How Ozempic and Weight Loss Drugs Are Reshaping Denmark's Economy*, N.Y. TIMES (Aug. 28, 2023), https://www.nytimes.com/2023/08/28/business/denmark-ozempic-wegovy.html (last visited Jan. 30, 2026).

**B. Development of NAION and Its Sequela**

78. NAION is a medical condition involving damage to the optic nerve resulting in the loss of vision.

79. NAION is irreversible and permanent.

80. NAION falls within the category of an eye stroke.

81. NAION is untreatable and can lead to permanent blindness.

82. While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

83. "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."

84. Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.

85. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.

86. Vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

87. Some NAION patients lose complete vision with no recovery in affected eye(s).

88. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble

reading, and may be unable to continue in their line of employment. Being blind in one eye, and certainly both eyes, results in bumps and falls and injuries related to the unseen impacts and accidents.

89. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[41]

90. About 15% of patients who have NAION in one eye eventually develop it in their other eye.[42]

91. GLP-1 RAs are treated as an established pharmacologic class (EPC) by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar chemical structure.

92. It has been known since at least 2016 that the human eye contains GLP-1 receptors.[43]

93. Defendants knew or should have known of the causal association between the use of Ozempic and the risk of developing NAION and its sequelae, but they ignored it.

94. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs.

95. The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[44]

---

[41] *Ischemic Optic Neuropathy,* Cleveland Clinic, (last medical review 6/30/2024), available at https://my.clevelandclinic.org/health/diseases/ischemic-optic-neuropathy (last visited Jan. 30, 2026).
[42] *Id.*
[43] C. Hernández et al., T*opical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes,* 65 DIABETES 172 (2016), https://doi.org/10.2337/db15-0443 (last visited Jan. 30, 2026).
[44] U.S. Food & Drug Admin., FDA Adverse Event Reporting System (FAERS) Public Dashboard,

96. A meta-analysis of all clinical trials of GLP-1RA drugs, including Novo Nordisk's own clinical trials, found a non-statistically significant increased risk of optic ischemic neuropathy.[45]

97. The authors note that optic ischemic neuropathy is rare and may have been underreported in clinical trials, leading to a lower estimated risk.[46]

98. The overall rate of optic ischemic neuropathy was higher in the treatment group than the control group: 5.6 and 3.0 cases per 100,000 patient-years, respectively. The authors also note that "inappropriate use of drugs for inducing weight loss in moderately overweight patients with low cardiovascular risk could be associated with rare, but severe, adverse effects, possibly including NAION.[47]

99. A Novo Nordisk spokesperson acknowledged that cases of NAION, which leads to severe and irreversible vision loss, were identified in Novo Nordisk's clinical trials.[48]

100. Defendants knew or should have known of the risk of NAION with use of Ozempic.

---

https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard (last visited Jan. 30, 2026).

[45] G.A. Silverii et al., *Glucagon-Like Peptide-1 (GLP-1) Receptor Agonists and Risk for Ischemic Optic Neuropathy: A Meta-Analysis of Randomized Controlled Trials*, DIABETES OBESITY & METABOLISM (2024), https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.16076 (last visited Jan. 30, 2026).

[46] *Id.*

[47] *Id.*

[48] Kevin Dunleavey, *After Studies Flag Possible Link Between Novo's Ozempic and Rare Eye Disorder, Danish Agency Calls for Probe*, FIERCE PHARMA (Dec. 17, 2024), https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited Jan. 30, 2026); *See also* Naomi Kresge, *Ozempic Link to Rare Vision Loss Risk Confirmed in Study*, BLOOMBERG (Dec. 13, 2024), https://www.bloomberg.com/news/articles/2024-12-13/ozempic-link-to-rare-vision-loss-risk-confirmed-in-large-trial (last visited Jan. 30, 2026).

101. Defendants conduct clinical trials and have access to case reports and medical literature that provides it with superior knowledge compared to the general public as to potential risks of its medications.

102. For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[49]

103. The event occurred within the Semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION.[50]

104. Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

105. On July 3, 2024, the Journal of the American Medical Association ("JAMA") – Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven

[49] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE), ClinicalTrials.gov, NCT03989232 (updated Feb. 13, 2023), https://clinicaltrials.gov/study/NCT03989232 (last visited Jan. 30, 2026).
[50] *Id.*

times greater than non-GLP-1 RA medications.[51]

106. The JAMA study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."[52]

107. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$; concordance coefficient = 0.84).[53]

108. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort

---

[51] Specifically, the study showed a cumulative incidence of NAION of 8.9% in type 2 diabetes patients taking semaglutide, compared to only 1.8% for patients not taking GLP-1RA medications, with a hazard ratio of 4.28. For overweight/obese patients, the cumulative incidence of NAION was 6.7% for patients taking semaglutide, compared to only 0.8% for those not taking GLP-1RAs, with a hazard ratio of 7.64. Jimena Tatiana Hathaway et al., *Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide*, 142 JAMA OPHTHALMOLOGY 732 (2024), https://jamanetwork.com/journals/jamaophthalmology/fullarticle/2820255 (last visited Jan. 30, 2026).

[52] *Id.*

[53] *Id.*

vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).[54]

109. The primary outcome of the JAMA study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[55]

110. It was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[56]

111. A meta-analysis of all clinical trials of GLP-1 receptor drugs, including Defendants' own clinical trials, found a non-statistically increased risk of optic ischemic neuropathy.[57] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk.[58] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[59]

112. On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish-Norwegian cohort study",

---

[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] Silverii GA, *Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy:* supra.
[58] *Id.*
[59] *Id.*

found an association between use of semaglutide for type 2 diabetes.[60]

113. This cohort study compared the risk of NAION among individuals with type 2 diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication.[61] The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[62]

114. In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023,[63] 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[64]

115. "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed."[65]

116. The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[66]

117. Interestingly, the study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes

---

[60] E. Simonsen et al., *Use of Semaglutide and Risk of Non-Arteritic Anterior Ischemic Optic Neuropathy: A Danish–Norwegian Cohort Study* (published online Dec. 11, 2024), https://doi.org/10.1101/2024.12.09.24318574 (last visited Jan. 30, 2026).
[61] *Id.*
[62] *Id.*
[63] J. Grauslund et al., Once-Weekly Semaglutide Doubles the Five-Year Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in a Danish Cohort of 424,152 Persons With Type 2 Diabetes, 10 INT'L J. RETINA & VITREOUS 97 (2024), https://doi.org/10.1186/s40942-024-00620-x (last visited Jan. 30, 2026).
[64] *Id.*
[65] *Id.*
[66] *Id.*

reached an all-time high for the years 2019-2023.[67]

118. Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION. The PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[68]

119. In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[69]

120. A case series published by Katz et al., "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[70]

121. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[71]

122. The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling and the

---

[67] *Id.*

[68] Danish Medicines Agency, *Suspicion of Rare Eye Condition From Ozempic Use to Be Investigated Further*, https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/ (last visited Jan. 30, 2026).

[69] Kevin Dunleavey, *After Studies Flag Possible Link Between Novo's Ozempic and Rare Eye Disorder, Danish Agency Calls for Probe*, FIERCE PHARMA (Dec. 17, 2024), https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited Jan. 30, 2026).

[70] B.J. Katz et al., *Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide*, JAMA OPHTHALMOLOGY (published online Jan. 30, 2025), https://doi.org/10.1001/jamaophthalmol.2024.6058 (last visited Jan. 30, 2026).

[71] *Id.*

initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

123. A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[72]

124. Despite the growing number of articles, reports, and an investigation by PRAC of the Danish Medicines Agency, Defendants still provide no warnings about the dangerous side effect of NAION in conjunction with use of Ozempic in the United States.

125. On June 6, 2025, the European Medicines Agency (EMA) determined the product information for Ozempic and Wegovy should be updated to include the risk of NAION with a warning to patients that upon sudden vision loss or worsening vision, a physician should be contacted right away and the medication should be stopped if NAION is confirmed.[73]

126. As of September 30, 2025, Section 4.4 of the labeling for Ozempic and Wegovy sold in Europe, "Special warnings and precautions for use," has been updated to state the following, "Data from epidemiological studies indicates an increased risk for non-arteritic anterior ischaemic optic neuropathy (NAION) during treatment with semaglutide. There is no

[72] Massy et al., *Increased Vision Impairment Reports Linked to Semaglutide: Analysis of FDA Adverse Event Data*, 23 BMC MED. 203 (2025), https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z (last visited Jan. 30, 2026).

[73] Eur. Medicines Agency, *PRAC Concludes Eye Condition NAION Is a Very Rare Side Effect of Semaglutide Medicines Ozempic, Rybelsus and Wegovy* (June 6, 2025), https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy (last visited Jan. 30, 2026).

identified time interval for when NAION may develop following treatment start. A sudden loss of vision should lead to ophthalmological examination and treatment with semaglutide should be discontinued if NAION is confirmed."[74]

127. Section 4.8 of the European label, "Undesirable effects," now warns of an "approximately two-fold increase in the relative risk of developing NAION, corresponding to approximately one additional case per 10 000 person-years of treatment."[75]

128. Patients taking Ozempic or Wegovy in Europe are also now directly warned of the risk of NAION in the Package leaflet: Information for the patient.[76]

129. Despite these changes to the European labeling, no such warnings exist on prescriptions sold in the United States.

**C. Defendants' Continuing Failure to Disclose the Risk of NAION and its Sequela**

130. According to the Drugs@FDA website, the label for Ozempic has been updated on at least thirteen (17) occasions since 2017, with the most recent update on June 1, 2026.[77] Despite the fact there are at least fourteen (14) iterations of the Ozempic label, Defendants' labels have not contained any warning or any information whatsoever on the increased propensity of Ozempic to cause NAION and permanent vision loss as suffered by Plaintiff.

131. To date, the Ozempic warning label is still devoid of any mention of NAION.

132. Furthermore, Defendants have failed to take any steps to otherwise warn the

---

[74] EUR. MEDICINES AGENCY, *Product Information: Ozempic*, https://www.ema.europa.eu/en/documents/product-information/ozempic-epar-product-information_en.pdf (last visited July 29, 2026).
[75] *Id.*
[76] *Id.*
[77] U.S. FOOD & DRUG ADMIN., *Drugs@FDA: FDA-Approved Drugs, Ozempic,* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=209637 (last visited July 29, 2026).

medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Ozempic, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

133. Nothing was or is stopping Defendants from adding a warning regarding the risk of NAION. Defendants could have at any time made "moderate changes" to the labels.

134. Specifically, Defendants could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Ozempic's label without any prior FDA approval.

135. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

136. Recently, the Third Circuit reaffirmed that plain text interpretation of the CBE supplement process in a precedential decision holding that the defendant in that case, Merck, could not rely on a preemption defense based on an allegedly irreconcilable conflict between federal (FDCA) and state (civil tort) law so long as the warning could have been effected via a CBE change. *See generally In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, Case No. 22-3412, D.I. 82 at 73 on the docket (J. Jordan) (3d Cir. Sept. 20, 2024) (noting "the availability of a label change via a CBE supplement is problematic for Merck, as will very often be the case for pharmaceutical companies raising an impossibility defense").

## PLAINTIFF SPECIFIC FACTS

137. On or around November 8, 2023, Plaintiff was prescribed Ozempic by his primary care provider.

138. Thereafter, Plaintiff filled his Ozempic prescription at his local pharmacy four times, and with Express Scripts five times.

139. On August 2, 2024, Plaintiffs' wife administered his Ozempic shot. The next morning, at age 50, Plaintiff woke up with what he described as foggy vision in his right eye, as if he had sunscreen in his eye.

140. On August 9, 2024, Plaintiff saw his optometrist who found swelling of the optic nerve in the right eye, type 2 diabetes without retinopathy, and referred him to Southeastern Retina Associates.

141. Before he could see the retina specialists, on August 11, 2024, Plaintiff went to the hospital complaining that his vision had gotten worse and was causing him headaches. The ER doctor noted Plaintiff's vision as "absent peripherally, and blurry/kaleidoscope colors centrally, only able to make out shapes." A CT of Plaintiff's brain was performed which noted no acute intracranial abnormalities.

142. On August 13, 2024, Plaintiff went to Southeastern Retina Associates where he was diagnosed with NAION in his right eye.

143. At all times material hereto, the Ozempic label failed to adequately warn Plaintiff and his medical providers of the true risks of taking Ozempic.

144. As a result of Defendants' actions and inactions, Plaintiff suffers from permanent vision loss and seeks damages associated with these injuries.

145. Defendants knew or should have known that use of semaglutide could lead to

severe and debilitating injuries suffered by Plaintiff and numerous other patients.

146. Defendants continue to downplay the risk of NAION and have not changed or provided any warnings to the public and medical community.

147. Defendants' Ozempic was at all times utilized and prescribed in a manner foreseeable to Defendants.

148. Plaintiff did not misuse or alter his Ozempic.

149. Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and his physicians the true and significant risks associated with this medication.

150. As a result of Defendants' actions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

151. As a direct result of being prescribed semaglutide and using Ozempic, Plaintiff has been permanently and severely injured, having suffered serious consequences.

152. As a direct and proximate result of his Ozempic use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

153. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Ozempic, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for the treatment of his weight loss and diabetes.

**EQUITABLE TOLLING OF STATUTE OF LIMITATIONS**

154. Defendants are estopped from relying on the statute of limitations defense because Defendants actively concealed information concerning known risks, side effects, and defects in Ozempic. Instead of revealing such information to the FDA or the public, Defendants have continued to represent Ozempic as safe for its intended use.

155. Defendants are and were under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with Ozempic. Because of Defendants' purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of such products, Defendants are estopped from relying on any statute of limitations defense

**COUNT I**

**STRICT LIABILITY – FAILURE TO WARN**

156. Plaintiff incorporates paragraphs 1-155 as though fully set forth herein.

157. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed the drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

158. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

159. Defendants, as a designer, manufacturer, distributer, and marketer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field, and further,

Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Ozempic were inadequate.

160. Plaintiff did not have the same knowledge as Defendants and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

161. Defendants had a duty to provide adequate warnings and instructions for Ozempic, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

162. Defendants had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Ozempic, as it became or could have become available to Defendant.

163. Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drugs like Ozempic to health care providers empowered to prescribe and dispense Ozempic to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled and continue to mislead the medical community about the risks and benefits of Ozempic, which resulted in permanent injuries to Plaintiff.

164. Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

165. Despite knowing that Ozempic causes unreasonable and dangerous side effects, Defendants continue to promote and market Ozempic without providing adequate clinically relevant information.

166. Defendants knew or should have known that consumers, Plaintiff, specifically, would foreseeably and needlessly suffer injuries as a result of Defendants' failures.

167. The Ozempic supplied to Plaintiff by Defendants was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold.

168. Defendants possessed knowledge and information confirming the defective and unreasonably dangerous nature of Ozempic but, despite this knowledge and information, Defendants failed and neglected to issue adequate warnings that Ozempic caused serious and potentially irreversible vision issues, optic nerve damage, and NAION. Defendants have yet to issue any warnings or recommendations that patients taking Ozempic undergo ophthalmological monitoring.

169. Defendants' failure to provide adequate warnings or instructions rendered Ozempic unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendants, and in that the risk of danger outweighs the benefits.

170. Defendants failed to provide adequate post-marketing warnings and instructions after Defendants knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

171. Defendants continued to aggressively promote and sell Ozempic even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

172. Defendants have an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Ozempic, and/or that there existed safer and or equally effective alternative drug products that do not pose this same risk.

173. At all relevant times, given its increased safety risks, Ozempic was not fit for the ordinary purposes for which it was intended.

174. At all relevant times, given its increased safety risks, Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

175. By failing to adequately test and research harms associated with Ozempic, and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Ozempic and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Ozempic.

176. The semaglutide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendants knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Ozempic, Defendants failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote Ozempic.

177. Ozempic is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendant had exercised all possible care in their preparation and sale.

178. The foreseeable risk of serious and potentially irreversible vision issues and harm

to the optic nerve caused by Ozempic could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendants provided reasonable instructions or warnings of these foreseeable risks of harm.

179. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT II

## STRICT LIABILITY – DESIGN DEFECT

180. Plaintiff incorporates paragraphs 1-155 as though fully set forth herein.

181. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

182. Defendants, as the holder of NDA, are responsible for communications to the

FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance, and pharmacovigilance.

183. Defendants, as a manufacturer, designer, distributer, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff.

184. Ozempic is designed in such a way that it posed an unreasonable risk of permanent vision loss and optic nerve injuries and was kept on the market despite being in a defective condition.

185. Defendants knew or should have known the Ozempic they developed, manufactured, labeled, marketed, sold, and/or promoted was defectively designed in that they posed a serious risk of severe and permanent vision and optic nerve injuries.

186. Defendants had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

187. Defendants sold, marketed and distributed products that are unreasonably dangerous for their normal, intended, and foreseeable use.

188. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Ozempic, a defective product which created an unreasonable risk to the health of consumers, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

189. The Ozempic supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable

to Defendants, posing a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

190. The Ozempic taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

191. The Ozempic taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

192. Ozempic causes serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes, harming Plaintiff and other consumers.

193. Plaintiff, ordinary consumers, and prescribers would not expect a diabetes or weight loss drug designed, marketed, and labeled for its supposed health benefits to cause irreversible vision issues and optic nerve damage.

194. The Ozempic supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

195. The Ozempic supplied to Plaintiff by Defendants was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of Ozempic makes the product unreasonably dangerous.

196. Ozempic's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

197. The intended or actual utility of Ozempic is not of such benefit to justify the risk of optic nerve damage that may be irreversible and permanently disabling thereby rendering the product unreasonably dangerous.

198. The design defects render Ozempic more dangerous than other drugs and therapies designed to treat type 2 diabetes and obesity and cause an unreasonable increased risk of injury, including, but not limited, to potentially irreversible vision issues and optic nerve damage.

199. Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

200. Ozempic is defective and unreasonably dangerous to Plaintiff and other consumers in that, despite knowledge that Ozempic use could result in vision issues, Defendant failed to adequately test or study the drugs, including but not limited to: pharmacokinetics and pharmacodynamics of the drugs, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

201. Defendants acted unreasonably in their design of Ozempic in that Defendants failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the

product.

202. Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Ozempic's defective design.

203. Ozempic a is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendant had exercised all possible care in the preparation and sale of these products.

204. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT III

## NEGLIGENT FAILURE TO WARN

205. Plaintiff incorporates by reference paragraphs 1-155 as if fully stated herein.

206. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed these drugs into the stream of commerce in

a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

207. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

208. Ozempic was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

209. Defendants owed Plaintiff and other Ozempic users a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling Ozempic.

210. At all times material, Ozempic was used in a manner intended and/or foreseeable to Defendants.

211. A reasonable patient or consumer of Ozempic would expect the drug to be free of significant defects.

212. Defendants knew or had reason to know of facts establishing that Ozempic could cause NAION and failed to warn of the risk.

213. At all times relevant hereto, the defective nature of Ozempic was known to Defendants, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Ozempic and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

214. In disregard of its duty to timely warn consumers of health risks associated with Ozempic, Defendants committed one or more of the following negligent acts or omissions:

a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's

treating physicians that Ozempic was designed and/or manufactured in a way that it could cause injuries and damages, including permanent vision loss;

b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;

c. Failing to timely warn Plaintiff and Plaintiff's physicians that a base line eye exam should be performed and monitoring was necessary.

215. At all relevant times, the label for Ozempic was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

216. At all relevant times, the label for Ozempic was inadequate because it did not warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including NAION.

217. The labels for Ozempic were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

218. Defendants' failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

219. Defendants' failure to warn of the significant risks of Ozempic use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Ozempic.

220. Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Ozempic, Plaintiff would not have elected to begin and/or continue Ozempic.

221. Reasonable, safer alternative treatments were available to Plaintiffs and/or

Plaintiff's treating physicians had they been warned of these significant risks outlined herein.

222. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT IV

## NEGLIGENCE

223. Plaintiff incorporates by reference paragraphs 1-155 as though fully set forth herein.

224. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

225. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-

market surveillance and pharmacovigilance.

226. At all relevant times, Defendants had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Ozempic products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

227. Defendants failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Ozempic in that Defendants knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

228. Defendants had no reason to believe that intended and foreseeable users of Ozempic, such as Plaintiff, would realize the potential harm from use of these products.

229. Defendants failed to exercise reasonable care to inform users, such as Plaintiff, of Ozempic's risk of serious and potentially irreversible vision issues and harm to the optic nerve.

230. Defendants breached their duty of care to the Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of Ozempic.

231. In disregard of their duties, Defendants committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Ozempic without thorough and adequate pre- and post-market testing of the products;

b. Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, and designing, and distributing Ozempic while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Ozempic;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Ozempic was safe for their intended use;

d. Failing to disclose and warn of the product defect to the medical community, and consumers that Defendant knew and had reason to know that Ozempic was indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that the Ozempic's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Ozempic;

g. Advertising, marketing, and recommending the use of Ozempic, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with, and inherent in, the use of this product;

h. Representing that Ozempic was safe for their intended use when in fact Defendants knew and should have known the product were not safe for their intended purpose;

i. Continuing to manufacture and sell Ozempic with the knowledge that Ozempic is unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Ozempic so as to avoid the risk of serious harm associated with the use of semaglutide. Failing to design and manufacture Ozempic so as to ensure these drugs were at least as safe and effective as other similar products;

k. Failing to design and manufacture Ozempic as reasonably safe for their intended purpose in violation of objective safety standards;

l. Failing to ensure that Ozempic was accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

m. Failing to ensure that Ozempic was accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Ozempic and that use of semaglutide created a high risk of severe, permanent injuries to vision; and

n. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Ozempic.

232. A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

233. As a direct and proximate result of the Defendants' negligent testing, monitoring, and pharmacovigilance of Ozempic, Defendants introduced products they knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent injuries to an individual's vision, and Plaintiff has been injured catastrophically and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

234. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT V

## NEGLIGENT MISREPRESENTATION AND MARKETING

235. Plaintiff incorporates by reference paragraphs 1-155 as though fully set forth herein.

236. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

237. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

238. At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Ozempic including, but not limited to, misrepresentations regarding the safety and known risks of Ozempic.

239. The information distributed by the Defendants to the public, the medical community, Plaintiff and Plaintiffs' healthcare providers, including advertising campaigns, labeling materials, print advertisements, commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Ozempic.

240. Defendants' conduct had the capacity to deceive and/or purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Ozempic and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Ozempic.

241. Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Ozempic and induce the public and medical community, including Plaintiff and Plaintiff's healthcare provider to request, recommend, purchase, and prescribe Ozempic.

242. Defendants have a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Ozempic, including its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

243. Defendants made continued omissions in the Ozempic labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

244. Defendants made additional misrepresentations beyond the product labeling by representing Ozempic as a safe and effective treatment for type 2 diabetes and/or weight loss with only minimal risks.

245. Defendants misrepresented and overstated the benefits of Ozempic to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to permanent vision loss.

246. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use Ozempic, thereby causing Plaintiff to endure severe and permanent injuries.

247. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were unable to associate the

injuries sustained by Plaintiff with Plaintiff's Ozempic use before it was too late. Defendants knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendants.

248. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Ozempic had the true facts not been concealed by the Defendants.

249. Defendants had sole access to many of the material facts concerning the defective nature of Ozempic and its propensity to cause serious and dangerous side effects.

250. At the time Plaintiff was prescribed and administered Ozempic, Plaintiff and Plaintiff's healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

251. The Defendants failed to exercise ordinary care in making representations concerning Ozempic while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because the Defendants negligently misrepresented Ozempic's risk of unreasonable and dangerous adverse side effects.

252. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendants, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Ozempic.

253. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

254. As a direct and proximate result of reliance upon Defendants' negligent

misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VI

## BREACH OF EXPRESS WARRANTY

255. Plaintiff incorporates by reference paragraphs 1-155 as though fully set forth herein.

256. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed them into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

257. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

258. Defendants expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendants and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for

physicians, patients, Plaintiff, and the general public, that Ozempic were safe, effective, fit and proper for their intended use.

259. Ozempic materially failed to conform to those representations made by Defendants, in package inserts and otherwise, concerning the properties and effects of Ozempic, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Ozempic sold to Plaintiff.

260. Defendants expressly warranted that Ozempic was safe and well-tolerated. However, Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Ozempic was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

261. Ozempic does not conform to those express representations because they are defective, not safe, and have serious adverse side effects.

262. Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety of Ozempic, and Defendants' representations became part of the basis of the bargain.

263. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendants' representations that Ozempic was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

264. Plaintiff's healthcare providers justifiably relied on Defendants' representations through Defendants' marketing and sales representatives in deciding to prescribe Ozempic over other alternative treatments on the market, and Plaintiff justifiably relied on Defendants' representations in deciding to purchase and use the drug.

265. Plaintiff purchased and used Ozempic without knowing that drug is not safe and well-tolerated, but that Ozempic instead causes significant and irreparable vision loss and eye damage.

266. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VII

## BREACH OF IMPLIED WARRANTY

267. Plaintiff incorporates by reference paragraphs 1-155 as though fully set forth herein.

268. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

269. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

270. Defendants was the seller of Ozempic and sold Ozempic to be taken for treatment of type 2 diabetes and weight loss.

271. When Ozempic was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

272. Defendants impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

273. At all relevant times, Defendants knew or should have known that Ozempic were unreasonably dangerous because of their increased risks of NAION and its sequelae, especially when the drug was used in the form and manner as provided by Defendants.

274. At all relevant times, Defendants knew or should have known that Ozempic had not been sufficiently and/or adequately tested for safety.

275. At the time Ozempic left Defendants' control, Ozempic did not conform to Defendants' implied warranties and was unfit for its ordinary purposes because Defendants failed to provide adequate warnings of the drug's causal association with increased risks of NAION and its sequelae.

276. At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as Plaintiff's prescribing physicians, would recommend, prescribe and/or dispense Ozempic for use by their patients to improve glycemic control in adults with type 2 diabetes, to reduce cardiovascular risk, and/or to aid in chronic weight management.

277. At all relevant times, Defendants reasonably anticipated and expected that

individuals, such as Plaintiff, would use and/or consume Ozempic for its ordinary purpose.

278. Despite the fact that Defendants knew or should have known that there was reasonable evidence of a causal association between Ozempic and unreasonably dangerous injuries, such as NAION and its sequelae, Defendants continued to market, distribute, and/or sell Ozempic to consumers, including Plaintiff, without adequate warnings.

279. The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

280. The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by Plaintiff's prescribing physicians, with the ordinary knowledge common to prescribing physician as to the drug's characteristics.

281. Plaintiff reasonably relied on Defendants' implied warranties of merchantability relating to Ozempic's safety and efficacy.

282. Plaintiff reasonably relied upon Defendants' skill and judgment as to whether Ozempic was of merchantable quality and safe and fit for its intended uses.

283. Upon information and belief, Plaintiff's prescribing physicians relied on Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to Ozempic.

284. Upon information and belief, Plaintiff's prescribing physicians reasonably relied upon the skill and judgment of Defendants as to whether Ozempic was of merchantable quality and safe and fit for its intended use.

285. Had Defendants not made these implied warranties, Plaintiff would not have used Ozempic, and/or, upon information and belief, Plaintiff's prescribing physicians would not have prescribed Ozempic, and/or would have altered their prescribing practices and/or would have

provided Plaintiff with adequate warnings regarding the dangers of Ozempic, to allow Plaintiff to make an informed decision regarding their use of Ozempic.

286. Defendants herein breached the aforesaid implied warranties of merchantability because Ozempic was not fit for its intended purposes.

287. Defendants' breaches of implied warranties of merchantability were a substantial factor in causing Plaintiff's injuries.

288. Defendants' breach of their implied warranties resulted in use of the unreasonably dangerous and a defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein, and prays for judgment in his favor and against Defendants awarding the following:

1. A monetary award, sufficient to compensate Plaintiff for his damages;

2. Actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

   a. actual and treble damages in such amount to be determined by this Court and as provided by law;

   b. exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

c. pre-judgment and post-judgment interest;

d. costs including court costs, and other litigation expenses; and

e. any other relief the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all Counts and as to all issues.

Dated: July 31, 2026 Respectfully Submitted,

BY: */s/ Courtney L. Mohammadi*

Courtney L. Mohammadi, Esq.
Pope McGlamry P.C.
Georgia Bar No. 566460
N. Kirkland Pope, Esq.
Georgia Bar No. 584255
3391 Peachtree Road NE
Suite 300
Atlanta, Georgia 30326
404-523-7706 (Phone)
courtneymohammadi@pmkm.com
kirkpope@pmkm.com
efile@pmkm.com

***Attorneys for Plaintiff***